UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

MATTHEW D. BOUTWELL, MARTY C. BREAZEALE,
DENNIS D. DONALD, and KELVIN P. NIXON

V.                                          CASE NUMBER: 2:06CV269 KS-MTP

JONES COUNTY, MISSISSIPPI; THE JONES COUNTY SHERIFF"S OFFICE; SHERIFF T. LARRY DYKES, in his official capacity as the Sheriff of Jones County, and Individually; THE JONES COUNTY BOARD OF SUPERVISORS; RANDALL KEITH PARKER in his official capacity as a former agent of the Southeast Mississippi Drug Task Force and individually; CHRISTOPHER DAVID SMITH in his official capacity as a former agent of the Southeast Mississippi Drug Task Force and individually; ROGER WILLIAMS in his official capacity as a former agent of the Southeast Mississippi Drug Task Force and individually; COVINGTON COUNTY, MISSISSIPPI; THE COVINGTON COUNTY SHERIFF'S OFFICE; SHERIFF ROGER WOOD SPEED in his official capacity as the Sheriff of Covington County, and Individually; THE COVINGTON COUNTY BOARD OF SUPERVISORS; JASPER COUNTY, MISSISSIPPI; THE JASPER COUNTY SHERIFF'S OFFICE; SHERIFF KENNETH CROSS in his official capacity as the Sheriff of Jasper County, and Individually; THE JASPER COUNTY BOARD OF SUPERVISORS; SMITH COUNTY, MS; SMITH COUNTY SHERIFF'S OFFICE; SHERIFF CHARLIE CRUMPTON, in his official capacity and Individually; SMITH COUNTY BOARD OF SUPERVISORS;  and JOHN DOES 1-15


PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS
TO COMPEL RULE 7(a) REPLY TO QUALIFIED IMMUNITY

Come now, the Plaintiffs, by and through their attorney, and file the following response to Defendants' Motions to Compel Rule 7(a) Reply to Qualified Immunity, to-wit:

Qualified Immunity

Government officers and officials are entitled to a defense of qualified immunity where their alleged unconstitutional conduct "does not violate clearly established . . . constitutional rights of which a reasonable person would have known." Harlow v.

Fitzgerald, 457 U.S. 800, 818 (1982). The primary focus is on the "objective reasonableness" of the officer's actions in the light of the legal principles that govern his conduct. Anderson v. Creighton, 483 U.S. 635 (1987). Where an objectively reasonable officer would not know that his conduct was unconstitutional because the legal standard had not been clearly established at the time or because the contours of the constitutional right did not provide sufficient notice that his conduct was violative of the right asserted, the officer is entitled to the qualified immunity defense. Id. See also United States v. Lanier, 520 U.S. 259. In Malley v. Briggs, 475 U.S. 335 (1986), the Court stated that there would be no immunity if the violation of law would be "apparent" to a reasonable officer in light of clearly established law. Immunity is inappropriate where a reasonably competent officer would have known his actions to be in violation of the Fourth Amendment. Id.

### a. Clearly established rights

It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer. See Scotto v. Almenas, 143 F.3d 105, 113 (2d Cir. 1998) (parole officer); Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 130 (2d Cir. 1997) (police officers); White, 855 F.2d at 961 (same); Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000). False charges levied against an individual create a classic constitutional violation: the deprivation of his liberty without due process of law. The liberty deprivation is the time he was illegally confined, and the due process violation is the manufacture of false evidence. Zahrey at 348.

If any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and

framing individuals for crimes they did not commit. Devereaux v. Abbey, 263 F.3d 1070, 1074-75 (9th Cir. 2001). Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction). Id. There is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government. Id. In each case the government official maliciously abuses a position of trust to induce the criminal justice system to confine and then to prosecute an innocent defendant. Id.

### b. Objectively unreasonable conduct

The relevant inquiry under this prong of a qualified immunity analysis is whether it would be clear to an objectively reasonable officer that his conduct violated the plaintiffs' constitutional rights. Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir.2002); see Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (explaining that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

No reasonable law enforcement officer would have thought it permissible to frame somebody for a crime he or she did not commit." Limone v. Condon, 372 F.3d 39 (1st Cir. 2004). When a violation of a fundamental right is so obvious that no half-way intelligent public official could conclude in good faith that his proposed action is constitutional, a public official who does it anyway cannot claim qualified immunity; the purpose of qualified immunity is to protect government officials from liability for conduct they could not reasonably have known was unlawful. Skurstenis v. Jones, 236 F.3d 678 (11th Cir. 2000).

No law enforcement officer could have truly believed that the knowing falsification and omission of evidence was objectively reasonable. Qualified immunity is designed to protect public officials who act in good faith, on the basis of objectively reasonable understandings of the law at the time of their actions, from personal liability on account of later-announced, evolving constitutional norms. The acts and omissions committed by the defendants in this case did not stem from a misunderstanding of their constitutional duties, nor were they undertaken in furtherance of legitimate public purposes that went awry. Rather, as alleged, the defendants engaged in a deliberate attempt to ensure the prosecution and conviction of innocent men. Such conduct violated the Plaintiffs' constitutional rights with "obvious clarity."

### I.  By the Individual Officers (Parker, Smith and Williams)

Although it should be abundantly clear that Plaintiffs' constitutional rights were violated by the individual officers, Plaintiffs' reiterate the following specific details as to each Plaintiff:

### a.  Boutwell

On November 2, 2005, at approximately 9 p.m., Connie Pittman and Boutwell left Ms. Polly Coker's drug and alcohol program.  Connie Pittman was driving a rental car at the time, and Boutwell was sitting in the passenger seat. They stopped at the Chevron station on Hwy 84 and Hwy 29 outside the city limits of Laurel, MS.  When Pittman and Boutwell pulled back onto Hwy 84, they were pulled over by then-Agent Randall Parker of the Southeast Mississippi Drug Task Force.  After asking Pittman for her license and proof of insurance, Parker asked Boutwell to step out of the car and proceeded to search him.  He found Boutwell's prescription Lortab and Xanax.  Parker than asked for

Pittman's consent to search the vehicle. Pittman would not give consent. Parker then called for a K-9 unit. Stan Livingston of the Laurel Police Department arrived with his canine. Jimmy Ray Sims and Chris Smith, both of the Southeast Mississippi Drug Task Force, also arrived on the scene by this time. Chris Smith pulled Boutwell, who was handcuffed at that time, to the back of Parker's car and said that he had heard that Boutwell "was passing out their cards and saying he was working for them." Smith then used his Taser to shock Boutwell in the side approximately five (5) times. Boutwell broke the side mirror on Parker's car trying to get away from Smith and his Taser. Parker then told Boutwell "he would learn to keep his medicine in the right bottle." Parker then asked Boutwell if he knew Crystal Bunch. Boutwell said he did.

After Boutwell had been in jail for one week, Parker took him before Justice Court Judge Beech for a bond hearing. This is the first time Boutwell learned he was being charged with possession of methamphetamine. Boutwell fully denies having possessed said methamphetamine.

Approximately two weeks later, Boutwell recalls then-Commander Roger Williams, Randall Parker and Chris Smith coming into his cell at the jail. They had a large syringe with which they injected him some unknown substance. They said they were giving him "dog hormones" so he could fight better. One of them then said something to the effect that they had never seen anyone tolerate so much. Roger said to give him more, and Randall said that was all he brought.

Boutwell remained illegally incarcerated in the Jones County Jail from November 2, 2005 through March 28, 2006.

## b. Breazeale

In June 2005, Breazeale was charged with possession of paraphernalia and driving under the influence by the Ellisville Police Department. The arresting officer contacted then-Agent Chris Smith of the Southeast Mississippi Drug Task Force to come and speak with Breazeale about "working" with the Task Force in exchange for his charges being dropped. Breazeale agreed to this proposal.

Chris Smith advised Breazeale to meet him at a predetermined location to receive his "buy money" and to be equipped with surveillance equipment. Chris Smith was not present when Breazeale arrived, so Breazeale departed. Breazeale then telephoned Chris Smith who advised him to return to the location, but Breazeale was unable to do so because he did not have any gas.

Breazeale returned to his residence and was sitting in his car when Chris Smith drove up. Chris Smith came to the window of Breazeale's vehicle and grabbed Breazeale by the hair and forcibly extricated Breazeale from the car through the window. Chris Smith then proceeded to beat Breazeale in the face and chest. Chris Smith then handcuffed Breazeale and transported Breazeale to the Jones County Adult Detention Center.

When Smith and Breazeale arrived at the jail and pulled into the sally port, Chris Smith took Breazeale from his county car, and while Breazeale was still handcuffed, Chris Smith began beating Breazeale again about the head and upper torso to the point that Breazeale was bleeding from various lacerations, as well as from his eyes and nose. Breazeale also began coughing up blood. Chris Smith advised Breazeale that it would be best if he (Breazeale) did not tell anyone what he (Smith) had done.

A correctional officer by the name of Barbara and two (2) other correctional officers observed the incident. Barbara took pictures of Breazeale's injuries. Subsequently, Breazeale was transported to South Central Regional Medical Center for treatment of his injuries.

### c. Donald

On or about December 2, 2005 Dennis D. Donald (hereinafter referred to as "Donald" and/or Claimant) was traveling between his home and Ellisville, MS on Will Hayes Road, when he was pulled over by Randall Parker of the Southeast Mississippi Drug Task Force. Parker opened the passenger door of Donald's truck and asked "Where's the dope?". By this time Chris Smith and Roger Williams had arrived. Smith pulled Donald from his truck by the throat and forcibly slammed Donald's body on the paved road. Smith then stomped on Donald's head and began grinding his head into the road. All this time, Smith, Parker and Williams continued to ask Donald where the drugs were while searching Donald's person and truck for any drugs. Smith handcuffed Donald to the grill on his county automobile. While Donald was handcuffed to the grill, Williams removed an object from a bag in the trunk of his car and proceeded to hit Donald in the calves with said object. The force of the blow caused Donald's body to flip over. During this incident which lasted at least two hours, the three former-agents took turns beating and kicking Donald. One three different occasions during this incident, the former agents stripped Donald naked for extended periods of time exposing his body to the freezing cold December night. At some point, Donald managed to crawl under Smith's car. Smith pulled Donald out from under the car and asked "How do you like this ass beating?". Donald remembers spitting on Smith's shoe before he lost

consciousness.  Donald awoke in the back of a deputy car in route to the Jones County Jail where he was charged with possession of a controlled substance, although no drugs were confiscated from Donald or his truck during the incident on Will Hayes Road.  After Donald was booked at the jail,  a male guard had to help him into a cell due to the injuries he sustained during the brutal beating.  Donald spent approximately eight weeks incarcerated in the Jones County Jail as a result of criminal charges levied by the Southeast Mississippi Drug Task Force.

Donald's truck was towed to impound at the Southeast Mississippi Drug Task Force on Highway 84 west of Laurel, MS.  When Donald was finally able to retrieve his truck, the front and back windows had been shot out and there were numerous bullet holes in the cab of the truck.[1]  The wrecker driver advised Mr. Donald that the truck was in that condition when he arrived on Will Hayes to tow the truck.  At the time of the incident, Donald had numerous items of personal property in his truck, including a wheel barrow, two Albu Garcia fishing rods, a miter saw, two skill saws, a JVC stereo system with speakers and amps, various other tools and implements, and a CD collection.  Donald drove by the impound yard and observed these items in his truck.   However, when Donald was finally permitted to pick up his truck, said items were missing.

### d.  Nixon

On or about November 20, 2005 agents of the Southeast Mississippi Drug Task Force came to Kelvin Paul Nixon's  (hereinafter referred to as "Nixon" and/or Claimant) home without a search warrant and performed a "search" of same.

---

[1] Mr. Donald's spare tire was also shot.  A bullet was recovered from the tire.  One of the law enforcement officials investigating the Task Force took custody of the bullet.

During the course of this "search" the agents "seized" and/or destroyed numerous items of property.  The following items were "seized": an HP digital camera, a JVC camcorder, knives, Nixon's son's sword collection, cell phone, Nixon's wedding band, and numerous DVDs.  The damage to the house and its contents was to the degree that it took two full days to straighten things up.  During the "search" of Nixon's home, the agents broke dishes, smashed televisions, broke children's toys, cut/ripped the living room and bedroom furniture, ripped up clothing, ripped a Queen size 400 thread count sateen bedding set, ripped the cushions of love seat, broke a wooden potato box, broke a wooden jewelry box with glass door, broke the legs/wheels on dining room chairs, broke the legs on the dining table, broke the back screen door, damaged the front door, busted a garden statue, knocked pictures off the walls, threw clothing on the floor and stomped on it, damaged the wood flooring in the bedroom, broke a bedside table, and spit chewing tobacco everywhere.

Upon leaving Nixon's home, the agents left a large sticker on Nixon's front door which read "This property has been searched for illegal substances compliments of the Jones County Sheriff's Office."  This sticker was large enough to be read from the road in front of Nixon's home.

Nixon was not arrested in connection with this incident, but thereafter former-agent Randall Parker commenced calling and sending text messages to Nixon, threatening Nixon if he did not "come to work" for the task force.  Parker claimed that the agents had found drugs in Nixon's house during the "search".  Nixon ignored Parker's threats.

On or about December 20, 2005, agents of the Task Force and Sheriff's Office returned to Nixon's home and claimed they had come to arrest him for the charges from November. Nixon was immediately handcuffed. While in handcuffs, Nixon was thrown into the door facing and into the side of patrol car and was kicked. Nixon was charged with possession of methamphetamine while in possession of a firearm, and booked into the Jones County Jail. He was released approximately twenty-four hours later on a $20,000 -$30,000 bond.

Parker "seized" Nixon's cell phone during this "arrest". Parker would send text messages to people on Nixon's cell phone while pretending to be Nixon. Following Nixon's arrest, Parker called Nixon and told him to come to the task force office and "get his stuff". When Nixon retrieved his belongings, many items were missing or damaged.

### ii. By the Sheriffs (Dykes, Speed, Crumpton and Cross)

The Southeast Mississippi Drug Task Force, hereinafter referred to as the "Task Force," was set up in an Interlocal Agreement which was adopted by the individual Board of Supervisors of the counties participating in the Task Force. See Exhibit 1. Under this Interlocal Agreement Sheriff Larry Dykes, Sheriff Roger Wood Speed, and Sheriff Kenneth Cross were members of the Board of Directors of Task Force. See Exhibit 1, p. 4. The Board of Directors was charged with meeting at least once a month to review the activities of the Task Force. See Exhibit 1, p. 4. The Board of Directors was also charged with hiring and supervising the Commander of the Task Force. See Exhibit 1, p. 5.

Upon information and belief Sheriff Dykes was specifically made aware of Deputy Chris Smith beating a handcuffed prisoner while inside the Jones County Adult

Detention Center, hereinafter referred to as the "jail." Sheriff Dykes attempted to Order the Captain of the Jail to come into the jail on his day off to transport a prisoner Smith assaulted to the hospital for medical assistance. The Captain of the jail refused because of Smith's history of assaulting individuals incarcerated in the jail, and the fact he often committed such assaults on the weekend necessitating the Captain come in to work on his day off. Upon information and belief the actions of the Captain at the jail put Sheriff Larry Dykes on actual notice of the brutality which was a regular mode of operations for the Task Force and the deputies, such as Smith, Parker, and Williams.

Upon information and belief the actual notice of the brutality and violation of the civil rights of the arrested Plaintiffs given to Sheriff Larry Dykes from the Captain of the jail acted as constructive notice given to the other members of the Board of Directors of the Task Force at their monthly meetings, as required under the terms of the Interlocal Agreement governing the Task Force and its operations.

Upon information and belief the Board of Directors of the Task Force did not meet during the last twelve (12) months of the Task Force's operations, rather than once a month as required under the Interlocal Agreement. Upon information and belief Sheriff Larry Dykes, Sheriff Roger Wood Speed, and Sheriff Kenneth Cross actively and intentionally failed to supervise the Task Force as required for members of the Board of Directors as set forth in the Interlocal Agreement which set up the Task Force. Upon information and belief had the Board of Directors of the Task Force met as required under the terms of the Interlocal Agreement the Board could have taken steps to ensure the Task Force members complied with the United States Constitution and did not brutalize handcuffed prisoners or plant evidence upon innocent individuals. Upon

information and belief the only way Sheriff Larry Dykes could have not been made aware of the repeated acts of assault upon incarcerated and/or handcuffed prisoners and the planting of evidence engaged in by the members of the Task Force is by actively working to keep from officially finding out about the problems of the Task Force.

Upon information and belief Sheriff Larry Dykes was put upon actual notice of the "tasering" of handcuffed prisoners because at least one of those events occurred in the Jones County jail. The employees of the jail were directed to avoid the members of the Task Force when those Task Force members brought arrestees into the jail. The employees of the jail were agents and employees of the Jones County Sheriff. The Captain of the jail is the Sheriff's agent at the jail. Upon information and belief the Captain of the jail, and through him Sheriff Larry Dykes and the Board of Directors of the Task Force, knew of the repeated brutalities of the members of the Task Force and instructed his employees accordingly so they would not be accused of brutality. Upon information and belief Sheriff Larry Dykes was constructively aware, if not actually aware, of the fact his correctional officers at the jail were distancing themselves from the actions of the Task Force officers, and collecting evidence when prisoners arrived at the jail so as not to be charged with brutality based upon the actions of the Task Force. Upon information and belief the employees of the jail made a practice of photographing and documenting the wounds and injuries evident upon prisoners arrested or transported by members of the Task Force. This occurred when Plaintiff Marty Breazeale was transported to the jail. Upon information and belief the female correctional officer at the jail who processed Plaintiff Breazeale into the jail took numerous photographs of the injuries suffered by Breazeale at the hands of Smith prior

to being placed in the jail. Upon information and belief Sheriff Larry Dykes was aware of the systematic and continuing efforts of his correctional officers at the jail to gather evidence disproving their involvement with the brutality committed by members of the Task Force.

Upon information and belief Sheriff Larry Dykes was made aware of the continual planting of evidence on innocent defendants by the Task Force by members of the general public who complained to him their family members were arrested when they had no contraband on them. Defendants Williams, Smith and Parker pled guilty to the criminal charge of planting evidence upon Plaintiffs. Upon information and belief Sheriff Larry Dykes was made aware of the planting of evidence upon Plaintiff Donald by members of Donald's family.

Plaintiffs would show unto the Court it is impossible for them to be more specific regarding the facts and circumstances of the actual and/or constructive knowledge of Sheriff Larry Dykes, Sheriff Roger Wood Speed, and Sheriff Kenneth Cross without completing the court-ordered discovery on the issue of Qualified Immunity. It is impossible to further detail the malfeasance and misfeasance of the members of the Board of Directors of the Task Force without completing the Discovery ordered by the court on the topic of Qualified Immunity.

    Respectfully submitted,

    MATTHEW D. BOUTWELL,
    MARTY C. BREAZEALE,
    DENNIS D. DONALD,
    and KELVIN P. NIXON

By:_/s/_____
Pamela L. Huddleston
Their Attorney

PAMELA L. HUDDLESTON
Attorney at Law
MS Bar No. 99176
Post Office Box 1194
Laurel, MS 39441-1194
(601) 649-9200
(601) 649-9270 fax

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I have this day electronically filed the above and foregoing Response via the ECF system which gives notice of said filing to all counsel of record.

This the 11th day of April, 2007.

/s/ Pamela L. Huddleston

Attorney for Plaintiffs